J-S51031-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.J.O., A MINOR  APPEAL OF L.E.S., MOTHER | : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | No. 588 EDA 2017 |

Appeal from the Decree January 12, 2017
in the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0001280-2016,
CP-51-DP-00000069-2013

| | | |
|---|---|---|
| IN THE INTEREST OF: I.I.O., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.E.S., MOTHER | : : : : : | |
| | : | No. 589 EDA 2017 |

Appeal from the Decree January 12, 2017
in the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0001281-2016,
CP-51-DP-00000070-2013

BEFORE:   BOWES, SHOGAN, JJ., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:          **FILED SEPTEMBER 06, 2017**

Appellant, L.E.S. ("Mother"), files this appeal from the decrees entered

January 12, 2017, in the Court of Common Pleas of Philadelphia County

_____

[*] Former Justice specially assigned to the Superior Court.

granting the petition of the Department of Human Services ("DHS") and involuntarily terminating her parental rights to her minor, dependent sons, A.J.O., born in November of 2009, and I.I.O., born in August of 2012 (collectively, the "Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[1,2] Mother further appeals the orders dated January 12, 2017, changing the Children's permanency goal to adoption pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6351.[3] After review, we affirm the trial court's decrees and orders.

The trial court summarized the relevant procedural and factual history as follows:

> The family in this case became known to DHS in 2009, before the Children were born, when DHS received a General Protective Services ("GPS") report that Mother had stolen a car and left Children's two siblings unsupervised. DHS obtained an Order for Protective Custody ("OPC") for these children on April 5, 2009.

---

[1] By separate decrees entered February 28, 2017, the trial court involuntarily terminated the parental rights of father and/or putative father, A.I.O. ("Father"), with respect to the Children. The court additionally entered a decree as to unknown father with respect to I.I.O. An appeal has not been filed by Father or any unknown father, nor is Father or any unknown father a party to the instant appeal.

[2] While the court referenced only Sections 2511(a)(2), (5), (8), and (b) on the record, Notes of Testimony ("N.T."), 1/12/17, at 101, in its decrees the court additionally included subsection 2511(a)(1). Decrees of Involuntary Termination of Parental Rights, 1/12/17.

[3] Orders changing the Children's permanency goals to adoption were not entered until February 28, 2017, upon termination of Father's parental rights.

This OPC was discharged on April 8, 2009, the temporary commitment was ordered to stand, and these children were placed in a foster home. These children were adjudicated dependent on April 23, 2009. They were reunified with Mother on May 1, 2010, and their dependent petitions were discharged. [A.J.O.] was born [in November 2009]. DHS implemented In-Home Protective Services ("IHPS") on April 9, 2012, after allegations of child abuse. On April 25, 2012, Mother was arrested for purchase and possession of a controlled substance. [In August 2012], DHS received a GPS report that Mother had tested positive for benzodiazepines and cocaine at the time of [I.I.O.]'s birth. On December 4, 2012, DHS received a GPS report that Mother had left [I.I.O.], who was three months old at the time, in a cab and had not returned. [I.I.O.] was taken to the hospital, but was discharged into Father's care soon afterwards. Mother was found guilty of possession on December 6, 2012, and sentenced to nine months of probation.

At a January 17, 2013, adjudicatory hearing, [A.J.O.], [I.I.O.,] and the two other children were adjudicated dependent and committed to DHS.[4] Mother was given twice weekly supervised visitation at the agency, and was referred to the Clinical Evaluation Unit ("CEU") for drug screen, dual diagnosis assessment, and monitoring. DHS was ordered to refer Mother for domestic violence counselling. On February 20, 2013, a Family Service Plan ("FSP") was developed, with a goal of reunification. At a March 7, 2013, permanency review, DHS was ordered to refer Mother for a parenting capacity evaluation, and back to CEU for three random screens and an assessment. Mother was found minimally compliant with her FSP objectives. At a June 10, 2013, permanency hearing Mother was again found minimally compliant, and was ordered to attend scheduled visitation. Mother was ordered to CEU for forthwith drug screening. She tested positive for benzodiazepines. On July 30, 2013, Mother tested positive for opiates and PCP and was discharged from her drug and alcohol treatment program for non-attendance.

_____

[4] Mother's two older children are not the subject of the within matter. Mother additionally has a younger child, who is not in care.

The FSP was revised on October 28, 2013. Mother's new goals were to stabilize mental health, maintain a relationship with the Children, eliminate domestic violence, and provide safe living conditions. Mother was found moderately compliant on October 21, 2013, permanency review. Mother did not attend mental health treatment between September 2013, and January 2014. On February 27, 2014, the FSP was revised and the Children's permanency goal was changed to adoption. It reverted to reunification after a September 24, 2014, FSP revision. At a November 6, 2014, permanency review, the court noted that Mother had visited consistently with the Children, had completed drug and alcohol treatment, domestic violence, and housing services. Mother was given unsupervised visits with the Children. Mother was found substantially compliant at the February 4, 2015, permanency review, and was referred to CEU for a forthwith drug screen. A March 11, 2015, FSP revision changed the Children's goal to adoption. Under this FSP, Mother was referred for a parenting capacity evaluation. Mother was moderately compliant at a May 7, 2015, permanency review, and was ordered for forthwith drug screen and three randoms.

DHS filed petitions for goal change and termination of Mother's parental rights on September 25, 2014, which were amended on August 13, 2015. The trial court heard the petitions on January 11, 2016. The court noted that Mother had shown substantial compliance with the permanency plan. The trial court denied termination of Mother's parental rights and instead ordered that the goal be changed from reunification to permanent legal custody.[5]

At a June 20, 2016, permanency review hearing, the court noted that Mother was moderately compliant with the permanency plan. Mother was offered supervised community visits with twenty-four hours' confirmation. Mother was referred to CEU for a drug screen with three random drug screens and to Behavioral Health System ("BHS") for consultation and/or evaluation. Mother was also ordered to comply with mental health treatment and medication, and to sign all appropriate releases and consents. In addition, Mother was ordered to provide

---

[5] While DHS appealed this determination, these appeals were ultimately withdrawn. Superior Court Docket Nos. 490-91 EDA 2016.

- 4 -

confirmation of employment. Mother tested positive for benzodiazepines at CEU on June 20, 2016, July 6, 2016, and July 15, 2016. On July 19, 2016, Mother was referred to the Achieving Reunification Center ("ARC"), but she was discharged on August 9, 2016, for failure to respond to outreach efforts.

On August 1, 2016, Mother arrived to a supervised visit with Children's siblings twenty-five minutes late and under the influence of an unknown substance. On August 9, 2016, Mother had a supervised visit with Children at which [I.I.O.] refused to greet Mother and when Mother requested a hug, he said "No," and ran back to the Community Umbrella Agency ("CUA") case manager ("CM"). Children sat with the CM to eat during the visit, though [A.J.O.] eventually joined Mother when she asked. [I.I.O.] refused to sit with Mother and cried, also repeatedly asking for his foster parent. During the same visit, Mother used profanity in front of the Children and vented about issues surrounding the case.

At a September 1, 2016, permanency review hearing, the court noted that Mother showed moderate compliance with the permanency plan. Mother was ordered to continue with weekly supervised visits at the agency, at Children's discretion, with twenty-four hours' notice. The court also noted that Mother was referred for housing and that she was employed at McDonald's. Mother was referred to CEU for a forthwith drug screen and five random drug screens. Mother was also ordered to provide documentation of her daily dosage of mental health medication to the CUA. CUA was ordered to refer Mother for a bonding evaluation.

Around December 2016, CEU issued a progress report for Mother which noted that Mother tested positive for opiates at CEU on September 16, 2016, and that on October 7, 2016, an object was found floating in Mother's urine at her drug screen, which was rejected. Mother tested negative for drugs on November 8, 2016, November 16, 2016, and November 17, 2016; however, her creatinine levels were 15, 3, and 3 mg/dl, respectively, meaning Mother's urine was fully diluted. The report also showed that Mother completed an assessment at CEU on November 16, 2016 and would be referred for outpatient dual diagnosis treatment at The Wedge Medical Center ("the Wedge"). On December 1, 2016, Mother submitted a urine sample for drug screen at CEU and tested negative for all substances, though her creatinine level was 4 mg/dl, again fully

diluted. A sample is considered fully diluted if the creatinine level is less than 20 mg/dl. In December 2016, CM learned that Mother has diabetes which can cause excessive thirst. (N.T. 1/12/17, pgs. 68-69). It still did not explain the full dilution of her urine because Mother's creatinine levels were normal on other drug screens. At different permanency hearings, the trial court always found reasonable efforts on the part of DHS. Mother was moderately compliant with the permanency plan and has not successfully completed her parental objectives. On December 22, 2016, DHS filed petitions to involuntarily termination [sic] Mother's parental rights and change the permanency goal to adoption.

The petitions for goal change and termination of parental rights were heard on January 12, 2017. At the time of the termination trial, Children were seven and four years old and had spent forty-eight months, four years, in the foster care system. (N.T. 1/12/17, pgs. 33, 56, 63). . . .

Trial Court Opinion ("T.C.O."), 4/7/17, at 1-4 (footnote omitted).

In support of its petitions to terminate parental rights and for a goal change, at the combined termination and goal change hearing on January 12, 2017, DHS presented the testimony of William Russell, Ph.D., licensed psychologist, who conducted a parenting capacity evaluation of Mother dated January 10, 2016[6] with Samantha Peterson, M.A., and was accepted as an expert in forensic psychology, and Giovanni Antonie, CUA case manager, Bethanna, as well as DHS Exhibits 1 through 3 and 5 through 8. Mother additionally testified on her own behalf.

_____

[6] Dr. Russell's evaluation was marked as DHS Exhibit 2.

Following the hearing, on January 12, 2017, the trial court entered decrees involuntarily terminating the parental rights of Mother pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). Thereafter, on February 10, 2017, Mother, through appointed counsel, filed notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925. On February 28, 2017, the trial court entered orders changing the Children's permanency goal to adoption. This Court consolidated Mother's appeals *sua sponte* on March 3, 2017.

On appeal, Mother raises the following issue for our review:

1. Did the trial court commit an error of law and abuse of discretion by involuntarily terminating Mother's parental rights under 23 Pa.C.S.[A.] [§] 2511 (a)(1), (2), (5), and (8) where the Department of Human Services failed to prove by clear and convincing evidence that Mother was unfit and/or unwilling to parent her Children?

Mother's Brief at 3.[7]

_____

[7] We observe that in her appellate brief, Mother stated her issues on appeal somewhat differently from her Rule 1925(b) Statement filed with her notice of appeal. Notwithstanding, we find that Mother has preserved challenges to the trial court's termination of her parental rights pursuant to Sections 2511(a)(1), (2), (5), and (8). Mother, however, failed to preserve a challenge related to the goal change and subsection (b) by failing to raise the issues in the statement of questions involved section of her brief. She also failed to present argument related thereto in her brief. As such, we find that Mother has waived these claims. *In re W.H.*, 25 A.3d 330, 339 n.3 (Pa.Super. 2011), *appeal denied*, 611 Pa. 643, 24 A.3d 364 (2011) (quoting *In re A.C.*, 991 A.2d 884, 897 (Pa.Super. 2010)) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived."). *See also In re M.Z.T.M.W.*,
*(Footnote Continued Next Page)*

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." **In re Adoption of S.P.**, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." **Id.** "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." **Id.** The trial court's decision, however, should not be reversed merely because the record would support a different result. **Id.** at [325-26, 47 A.3d at] 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. **See In re R.J.T.**, [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

**In re T.S.M.**, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." **In re M.G. & J.G.**, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite

_(Footnote Continued)_ ─────────────

2017 WL 2153892 (Pa.Super. May 17, 2017) (holding that the appellant waived her challenge to Section 2511(b) by failing to include it in her concise statement and statement of question involved). Nevertheless, in light of the bifurcated analysis, we review subsection (b) _infra_ and determine that, had Mother preserved this issue, we would have found it lacked merit.

result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M., II*, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998)).

In the case *sub judice*, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8), as well as (b). We have long held that, in order to affirm a termination of parental

rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we analyze the court's termination decree pursuant to subsections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015) (quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002)).

In the instant matter, in finding grounds for termination pursuant to Section 2511(a)(2), the trial court reasoned,

Children were taken into DHS custody because Mother was unable to provide essential parental care: child abuse was reported concerning [A.J.O.]; Mother left [I.I.O.], three months old at the time, in a taxi cab and did not return; Mother was later incarcerated; and both [c]hildren had been born with drugs in their system. Mother is unable to remedy the causes of her repeated and continued incapacity to provide Children with essential parental care, control, or subsistence necessary for Children's physical and mental well-being. Mother did not successfully complete all of her objectives, and was moderately compliant with the permanency plan since January 11, 2016, the date the court previously denied DHS' request to terminate her rights. Mother admitted that her one[-]bedroom apartment is insufficient housing. Mother was referred more than once to ARC for housing and was discharged in August 2016 for noncompliance. Mother also failed to promptly notify CM about her back-rent notice, and waited until about a month later to

- 11 -

inform CM and request assistance. Mother has made very little effort in finding appropriate housing. Mother was showed [sic] income-based housing, but she failed to take advantage of the opportunity. Mother has no suitable housing. Mother was ordered by the court to maintain her job at McDonald's, but she left her employment without any reason. Mother claims that she has another job, but she has failed to provide any documentation verifying employment after being asked numerous times. Up until November 29, 2016, Mother was attending her mental health program and taking her prescribed medication. Mother's drug screens from December 1, 2016, through the first week of January 2017 indicate that Mother is not taking her prescribed medication of benzodiazepines, as testified by the [p]sychologist, due to relatively low dosage in her urine at five nanograms per milliliter. Mother's erratic behavior at visits and family therapy sessions causes a lot of concern as to whether her mental health treatment is effective. Mother routinely uses profanity and becomes very aggressive and belligerent toward adults and the Children. Mother tries to interrogate the Children as to why they refuse to visit with her, causing both [c]hildren immense distress. The psychologist testified that Mother had difficulty accepting any responsibility for why her [c]hildren are in foster care. The [p]sychologist testified that he was unable to confirm Mother's weekly visits to seek her medication. The [p]sychologist testified that he was concerned that Mother was prescription shopping. The [p]sychologist further testified that Mother was not in a position to parent the Children in her current state. Mother testified that she did not have a drug problem. Mother was ordered to attend the [W]edge drug and alcohol treatment program. Mother had an intake, but never returned. Mother admitted to not complying with court orders. Mother did comply with drug screens on December 1, 2016, to the first week in January 2017. Mother had three drug screens, whereby her creatinine level was fully diluted. The drug screen results show that Mother is washing her urine. Mother claims that her diabetes may be the cause for the dilution of her urine. However, the court took judicial notice that previous drug screens provided by Mother showed that Mother was able to maintain normal creatinine level. Mother has not successfully completed a drug and alcohol program. As to her visits, Mother is very inconsistent, which Mother admitted. Mother failed to confirm her visits on numerous occasions, without valid reasons. Whenever she visits, Mother's behavior is so inappropriate and erratic that the visit is either cancelled or

she causes immense distress to the Children whereby they become afraid of Mother. Subsequently, the Children do not want to visit with Mother. Mother attempts to bribe the Children with food or false expectations to make them visit with her. Mother is unable to prioritize Children's needs over her needs. Mother's behavior has also caused strife between the Children and their other siblings. Mother has failed to take affirmative steps to place herself in a position to parent Children. Children need permanency, which Mother cannot provide. Mother lacks the motivation to follow through with and complete the steps necessary to place herself in a position to parent Children. Mother is unable to meet the Children's physical and emotional needs. Therefore, DHS met its burden under §2511(a)(2) of the Adoption Act and termination under this section was proper.

T.C.O. at 10-12 (citations to record omitted).

Mother, however, argues that DHS did not present clear and convincing evidence as to subsection (a)(2). Mother's Brief at 16. Mother maintains that she completed a parenting capacity evaluation, engaged in mental health treatment and gained the relevant insight for the reason the children came into care. She further avers she obtained employment, intended to "reconfigure" her apartment to accommodate the children and "make the apartment work," consulted with her landlord to secure a larger apartment, "consistently" attended visitation, and completed parenting classes and domestic violence counseling. *Id.* at 17-22. Mother further asserts a lack of evidence of ongoing substance abuse. *Id.* at 22. Mother indicates that she completed drug and alcohol treatment in November 2014. *Id.* Despite the testimony of the CUA case manager, since that time, she has had negative drug screens. While the drug screens evidenced low creatinine levels, Mother argues that she was diagnosed with diabetes. *Id.*

at 23-24. Moreover, although Mother did not complete a second treatment program at the Wedge, Mother posits that this does not suggest an ongoing substance abuse problem. *Id.* at 24-25. More importantly, Mother indicates that her employment conflicted with treatment and she, therefore, chose to maintain employment, another objective. *Id.* at 25. We disagree.

A review of the record supports the trial court's determination of a basis for termination under Section 2511(a)(2). Mother failed to complete her established FSP objectives aimed at reunification with the Children. At the time of the hearing, the Children had been in placement for approximately four years, I.I.O. for almost his entire life. N.T., 1/12/17, at 33, 63. CUA case manager, Giovanni Antonie, recounted Mother's FSP objectives as compliance with CUA and court orders, mental health treatment, and visitation with the Children, as well as securing suitable housing. N.T. at 33-34. Notably, employment and drug and alcohol treatment became the subject of court order. *See* DHS Exhibits 3, 5, 6. *See also* N.T. at 36, 49. Mr. Antonie described Mother's compliance as "moderate." N.T. at 53. Further, Dr. Russell, who conducted a parenting capacity evaluation of Mother in January 2016, recognized a "pattern of the inability or unwillingness to comply with the family service plan in order to get your children from this situation where they can be safe and permanent." *Id.* at 22.

As to housing, Mother remained in the same one-bedroom apartment which she admitted was "insufficient." *Id.* at 34, 92. Not only was Mother

shown income-based housing, she was referred a second time to ARC on July 19, 2016, but was discharged on August 9, 2016 for non-compliance with outreach. *Id.* at 34-35. In addition, CUA, despite untimely and delayed notification from Mother, also submitted an application to receive funding for back-rent on November 1, 2016. *Id.* at 38-39. According to Mr. Antonie, Mother now references "making her current apartment work." *Id.* at 39, 92.[8] He continued, "She is already referred to the DHS housing unit and she states that she continues to look for appropriate housing[,] but we have nothing tangible to verify." *Id.* at 39-40. Likewise, after failing to maintain employment at McDonald's, Mother represented she had obtained new employment as of January 6, 2017, although she failed to supply any verifying documentation thereof.[9] *Id.* at 36-38.

Although Mother's visits with the Children were unsupervised for a time, when Mr. Antonie began to oversee the case in June 2016, Mother's visits were again supervised and inconsistent. *Id.* Significantly, Mr. Antonie recounted numerous incidents during visitation involving Mother which served to impact negatively upon her bond with the Children as well as her

---

[8] Mother testified similarly, suggesting she could "reconfigure" her apartment. *Id.* at 84.

[9] Mr. Antonie acknowledged that Mother may have failed to provide this documentation due to lack of time. *Id.* at 38.

two older children's relationship with the Children.[10]  *Id.* at 41-52, 64-67. For example, Mr. Antonie reported an incident in July of 2016 where Mother slapped one of the Children's older siblings in the face and then proceeded to yell profanities at the Children through a car window for two to three hours, upsetting them.  *Id.* at 42.  As a result, Mother's visitation was suspended by the CUA until the Children were engaged in therapy.  *Id.* at 43.  At the following visit in August 2016, the Children were hesitant to greet and interact with Mother upon commencement.  I.I.O. was scared and stayed with Mr. Antonie and cried for thirty minutes.  During the visit, Mother was belligerent and used inappropriate language.  Mr. Antonie described little interaction between Mother and the Children, and upon conclusion, the Children were excited to see the foster parents.  *Id.* at 64-66.  By court order in September 2016, visitation was thereafter at the Children's discretion.  Permanency Review Order, 9/1/16.  Notably, CUA again suspended visitation, cancelling a visit at the end of October 2016 due to Mother's behavior.  *Id.* at 51-52.  At the time of the hearing, Mr. Antonie indicated that neither child desired visitation with Mother.  *Id.* at 58.  A.J.O. last visited with Mother on September 3, 2016.  *Id.* at 53.  I.I.O. last visited with Mother on October 22, 2016.  *Id.* at 53.  When asked for the Children's

---

[10] According to Mr. Antonie, Mother was belligerent, used inappropriate language and discussed inappropriate topics, and interrogated the Children, including using her older children, as to their desire not to visit.  *Id.* at 41-52, 64-66.

rationale, Mr. Antonie indicated the Children described Mother as "scary." *Id.* at 47.

Moreover, Mr. Antonie expressed continuing concerns with Mother's behavior related to mental health and substance abuse. *Id.* at 41, 45, 48-49. These concerns were echoed by Dr. Russell. *Id.* at 23-25. While the record reflects that Mother completed drug and alcohol treatment in 2014, Permanency Review Order, 11/16/14, Mr. Antonie observed "multiple occasions" where Mother was "seemingly under the influence." N.T., 1/12/17, at 48-49. After assessment by the CEU on November 16, 2016, Mother was referred to an outpatient dual diagnosis treatment program at the Wedge. *Id.* at 49; DHS Exhibit 3. Despite acknowledging that she was court-ordered to attend the program, Mother failed to attend beyond intake. Mother explained that she secured employment and did not want to forego income. *Id.* at 49, 89-90. Significantly, Mr. Antonie disclosed that Mother did not admit any issues with drugs and alcohol and indicated her belief that she "didn't need" the program "because she doesn't do drugs." *Id.* at 49.

Further, screening by the CEU in September 2016 was positive for opiates, and an object was found floating in Mother's urine sample in October 2016. DHS Exhibit 3. Subsequent CEU screenings in November and December of 2016 and January of 2017 revealed creatinine levels suggesting

dilution.[11]  *Id.* at 70-72; DHS Exhibits 3, 8.  The screenings from December of 2016 and January of 2017 also revealed traces of cocaine, marijuana, opiates, as well as barbiturates and benzodiazepines.  *Id.*  Dr. Russell also expressed concerns regarding Mother's continued substance abuse and feared that she was potentially "prescription shopping."  *Id.* at 20, 23.

Mr. Antonie testified regarding documentation from Cognitive Behavioral Health Services suggesting that Mother, who was diagnosed with depression and anxiety, *id.* at 14; DHS Exhibit 2 at 7, 12, was in "treatment compliance" as of November 29, 2016.  However, five attempts to obtain any subsequent documentation were unsuccessful.[12]  *Id.* at 40.  Mr. Antonie also stated that he "discussed with Mother the fact that [he] need[s] documentation from Cognitive Behavioral Health regarding her treatment" and that "she could or should get that documentation and provide it to [him]."  *Id.* at 40.  Notably, Mr. Antonie was concerned about Mother's cooperation with mental health treatment.  He testified to "quite a few

---

[11] Mr. Antonie acknowledged that Mother was diagnosed with diabetes.  He did not, however, concede a correlation with creatinine levels.  *Id.* at 68-69. Further, Dr. Russell explained that "the most common form of specimen tampering is sample dilution which would bring in a very low creatinine level." *Id.* at 25.

[12] Mother testified she remained actively engaged in mental health treatment.  *Id.* at 82-83.  Critically, however, the trial court found Mr. Antonie to be credible and Mother not to be credible.  *Id.* at 101.

incidents with [M]other during supervised visits or agency visits that would question behavior and cooperation with mental health treatment." *Id.* at 41-42.

Lastly, Dr. Russell noted that Mother was "avoidant and minimizing" with respect to the causes for the Children being placed into care. *Id.* at 16. Further, he indicated that concerns persisted such that Mother was unable to provide for Children's safety and permanency. Dr. Russell stated, "At this point, I have heard nothing that would indicate she has made any significant change in her behavior or her history and at this time she would continue to remain unable to provide safety and permanency for her children." *Id.* at 26. Similarly, Mr. Antonie testified, "[S]ince I've had the case, besides the last two months I would say, her behavior has been erratic and detrimental to the [C]hildren when she's in their presence." *Id.* at 54. He indicated Mother was not in a position for reunification. *Id.* at 57.

As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006). Hence, the record substantiates the conclusion that Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused the Children to be without essential parental control or subsistence necessary for their physical and mental well-being. *See In re*

***Adoption of M.E.P.***, 825 A.2d at 1272. Moreover, Mother cannot or will not remedy this situation. ***See id.*** As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b), and we, therefore, need not address any further subsections of Section 2511(a). ***In re B.L.W.***, 843 A.2d at 384.

We next determine whether termination was proper under Section 2511(b). Our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." ***In re K.M.***, 53 A.3d 781, 791 (Pa. Super. 2012). In ***In re E.M. [a/k/a E.W.C. & L.M. a/k/a L.C., Jr.]***, [533 Pa. 115, 123, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. ***In re K.M.***, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

***In re T.S.M.***, 620 Pa. at 628-29, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." ***In re K.Z.S.***, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations omitted).

Moreover,

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219 (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and citations omitted).

In the case *sub judice*, in reasoning that termination of Mother's parental rights favors the Children's needs and welfare under Section 2511(b) of the Adoption Act, the trial court stated,

Mother was inconsistent in her visits with the Children, even missing [I.I.O.]'s birthday without so much as a phone call. Mother's belligerent outbursts and use of profanity in front of Children scared them leading to them not wanting to see her. Mother tried to interrogate the Children multiple times about why they did not want to visit with her, which distressed the Children immensely and resulted in Children refusing to visit with Mother. [A.J.O.] last visited with Mother in September 2016 and [I.I.O.] last visited Mother in October 2016. When Children were still visiting Mother, they were excited to see the foster parents at the end of the visit, even running to greet them. Children are

very much attached to the foster parents, who take care of all Children's needs, and Children are generally quite happy. Mother does not participate in IEP meetings or [A.J.O.]'s therapeutic services. The foster parents take both Children for weekly outpatient therapy; Mother has never inquired into Children's progress in school or therapy. Children are in a safe, permanent, and pre-adoptive home. DHS witnesses were credible, while Mother was not. CM testified that adoption is in the best interests of both Children and neither would suffer irreparable harm if Mother's parental rights were terminated. Consequently, the trial court did not abuse its discretion when it found, by clear and convincing evidence, that there was no parental bond and that termination of Mother's parental rights would not destroy an existing beneficial relationship.

T.C.O. at 16-17 (citations to record omitted).

Upon review, we conclude the record supports the trial court's finding that the Children's developmental, physical and emotional needs and welfare favor termination of Mother's parental rights pursuant to Section 2511(b). There was sufficient evidence to allow the trial court to make a determination of the Children's needs and welfare, and as to the existence of a bond between Mother and the Children that, if severed, would not have a detrimental impact on them.

As indicated, Dr. Russell opined that Mother cannot provide for Children's safety and permanency. N.T., 1/12/17, at 25-26. He, as well as CUA case manager Mr. Antonie, expressed continuing concerns as to Mother's substance abuse and mental health. *Id.* at 23-25, 41, 45. Critically, as also noted, Mr. Antonie, who did not recommend reunification, *id.* at 57, described Mother's behavior as "erratic and detrimental to the children." *Id.* at 54.

- 22 -

Moreover, and more importantly, the Children are no longer interested in seeing and having visitation with Mother. *Id.* at 53, 58. Rather, the Children are in a pre-adoptive foster home where they have adjusted and are doing well. N.T. at 32, 58. The Children look to their foster parents to meet their needs.[13] *Id.* at 60-61. As testified by Mr. Antonie,

> Q. As far as the children, how have they transitioned to this foster home with [foster family]?
>
> A. They've done extremely well in the short period of time. The first few weeks the foster mother did take off of work to acclimate the boys to the home. They're both registered in school and have friends and they feel very happy. Whenever I see them, they're very excited to be where they are. Recently I think it was [A.J.O.] who told me that he wants to stay here forever.
>
> Q. Okay. And what about [I.I.O.]? How is he bonding to the foster home?
>
> A. He's very attached to both of the parents. When I'm at the home, I can see him wanting to be held by both of them. When he has an issue, he adheres to the structure they laid out for him and he would ask to talk about certain things which is very new to [I.I.O.].

*Id.* at 58. As a result, Mr. Antonie indicated that adoption was in the Children's best interests. *Id.* at 61-62. He expressed that the Children would not suffer irreparable harm by terminating Mother's rights. *Id.* As to A.J.O., Mr. Antonie explained, "He makes it very clear he wants no contact

_____

[13] Mr. Antonie related that both children receive therapeutic services. Further, A.J.O. has an IEP and receives speech therapy. Mother does not participate. *Id.* at 58-61.

- 23 -

with [M]other and this has been ongoing for the past four months. He's very attached and bonded to his new community. And I think going backwards would be detrimental to him." *Id.* at 61. Similarly, as to I.I.O., Mr. Antonie stated, "He's also very attached and bonded to his new atmosphere. He's gained a lot of weight. He looks much healthier. And also moving backwards for him would be detrimental to his progress." *Id.* at 62-63.

Thus, as confirmed by the record, termination of Mother's parental rights serves the Children's developmental, physical and emotional needs and welfare. While Mother may profess to love the Children, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id.* at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted).

Accordingly, based upon our review of the record, we find no abuse of discretion. We conclude that the record supports the termination of Mother's parental rights under 23 Pa.C.S.A. § 2511(a)(2) and (b), and the goal change to adoption.

Decrees and orders affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>9/6/2017</u>